No. 19-3372

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

EDWARD HILLS,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Northern District of Ohio, Eastern Division,
Case Number 16cr329**

———————————

## BRIEF OF DEFENDANT-APPELLANT
———————————

RUSSELL S. BENSING
600 IMG BUILDING
1360 EAST NINTH STREET
CLEVELAND, OH 44114
(216) 241-6650

*Counsel for Defendant-Appellant
Edward Hills*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ................................................................................. iv

Statement in Support of Oral Argument ......................................................1

Statement of Jurisdiction ............................................................................2

Statement of Issues .....................................................................................4

Statement of the Case .................................................................................5

    Background. .............................................................................................5

    A summary of the government's case. .....................................................6

        Dental Residency Bribery ...................................................................8

        Increases to Incentives. ......................................................................9

        Dental Patient Referral and Bribery ..................................................10

        Free Labor Scheme. ..........................................................................11

        Ohio Heath Enrichment. ...................................................................13

        Attorney Scheme. ..............................................................................14

        Obstruction of Justice. ......................................................................15

    The proceedings. ...................................................................................18

Summary of Argument ..............................................................................20

Law and Argument ....................................................................................21

    I.  The District Court erred in denying the motion for judgment of acquittal as to Counts 1, 8, 13, 14-20, and 29. ...........................................................21

        A.  Standard of Review. ....................................................................21

        B.  Count 1. ......................................................................................21

            1.  Dental residency bribery scheme. ........................................22

i

2. Oral Health Enrichment scheme. ...........................................................24

3. Dental patient kickback scheme. ........................................................26

4. Obstruction of justice. .......................................................................29

5. Attorney Scheme. ..............................................................................33

6. Free labor at Noble Dental Clinic. .....................................................34

II. The District Court erred in denying the motion for judgment of acquittal as to Count 2. ...................................................................................................35

    A. Standard of Review. ........................................................................35

    B. The incentives and the stream of benefits. ....................................35

    C. The reduction in work hours. .........................................................38

    D. The official act requirement of Hobbs Act conspiracy. ...............39

III. The district court erred in its jury instructions on Hobbs Act conspiracy by refusing to give an instruction on a requirement that there be an overt act. ........42

    A. Standard of review. .........................................................................42

    B. The jury instruction. .......................................................................42

IV. The district court erred when it failed to instruct the jury that actions taken in "good faith" are not done with an intent to defraud. ........................................43

V. The district court erred in defining the term "official act". ...........................45

VI. The district court erred when it instructed the jury about "as the opportunities arise" bribery. .................................................................................47

VI. The district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss. ....................................50

    A. Standard of Review. ........................................................................50

    B. Overview. .........................................................................................50

    C. The loss calculation. .......................................................................51

    1. The incentive payments. ...........................................................51

    2. Salary for Dr. Nassar. ...............................................................51

    3. Salaries for the Flextime program. ........................................................52

    4. Oral Health Enrichment. ..........................................................................55

    5. Resident bribery scheme. ........................................................................55

    6. Noble Dental Clinic. ................................................................................56

    7. Correct calculation of loss. .....................................................................56

  D. High-ranking public official. ....................................................................56

  E. Leadership role. .........................................................................................58

  F. Obstruction of justice.................................................................................60

  G. Two bribes..................................................................................................61

  H. The correct Guideline calculation.............................................................61

  I. Restitution..................................................................................................61

Conclusion ...........................................................................................................63

Certificate of Compliance ...................................................................................64

Certificate of Service ..........................................................................................64

Designation of Relevant Documents ...................................................................65

# TABLE OF AUTHORITIES

**Cases**

*Carella v. California*, 491 U.S. 263 (1989) ...............................................................43

*Gall v. United States*, 552 U.S. 38, (2007) ...............................................................50

*Hoover v. Garfield Heights Municipal Court*, 802 F.2d 168 (6th Cir. 1986) .........42

*McDonnell v. United States*, 136 S.Ct. 2355 (2016) ............................ 39, 40, 47, 48

*Phoenix Fed. S&L Ass'n., F.A. v. Shearson Loeb Rhodes, Inc.*, 856 F.2d 1125 (8th

    Cir. 1988), cert. den. 489 U.S. 1066 (1989) ........................................................21

*United States v. Benton*, 852 F.2d 1456 (6th Cir. 1988)..........................................42

*United States v. Bullock*, 526 F.3d 312, 315 (6th Cir. 2008)...................................50

*United States v. Doss,* 630 F.3d 1181 (9th Cir. 2011) ..............................................33

*United States v. Farrell*, 126 F.3d 484 (3rd Cir. 1997) .................................... 32, 33

*United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir.1981) ....................................44

*United States v. Holcomb*, 625 F.3d 287 (6th Cir. 2010) .........................................50

*United States v. Hull*, 456 F.3d 133 (3rd Cir. 2005)................................................33

*United States v. Jones*, 102 F.3d 804 (6th Cir. 1996)...............................................21

*United States v. Kozerski*, 2020 U.S. App. LEXIS 24808

    (6th Cir., August 6, 2020) ....................................................................................54

*United States v. Lee*, 919 F.3d 340, 358 (6th Cir. 2019) ............................ 39, 41, 47

*United States v. McGuire,* 744 F.2d 1197 (6th Cir. 1984).......................................44

*United States v. Miner*, 774 F.3d 336 (6th Cir. 2014) ..................................... 42, 43

*United States v. Oliver*, 919 F.3d 393 (6th Cir. 2019)...................................50

*United States v. Pennington*, 168 F.3d 1060 (8th Cir. 1999)...................................33

*United States v. Silver,* 948 F.3d 538 (2nd Cir. 2020)................................ 48, 49, 50

*United States v. Stafford*, 721 F.3d 380 (6th Cir. 2013) ...........................................50

*United States v. Turkette*, 452 U.S. 576 (1981) ...........................................21

*United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019)..................................46

*United States v. Vela*, 624 F.3d 1148, 1154 (9th Cir. 2010)....................................42

*United States v. Wang*, 222 F.3d 234 (6th Cir. 2000)............................................21

**Statutes**

18 U.S.C. § 203 (a)(3)...................................................................39

18 U.S.C. §1341 ......................................................................2

18 U.S.C. §1349 ......................................................................2

18 U.S.C. §1512(b) ............................................................... 29, 32

18 U.S.C. §1512(k) ...................................................................2

18 U.S.C. §1951 ......................................................................2

18 U.S.C. §1962(d) ................................................................2, 21

18 U.S.C. §371 ........................................................................2

26 U.S.C. §7206(1) ...............................................................................2

28 U.S.C. §1291 ....................................................................................3

42 U.S.C. §1320a-7b(b)(1)(A) ...............................................................2

U.S.S.G. §2C1.1, Application Note 4 (A) ...........................................56

U.S.S.G. §2C1.1, Application Note 4 (B) ............................................57

U.S.S.G. §3B1.1 ...................................................................................58

USSG § 2C1.1 .......................................................................................61

USSG § 3C1.1 .......................................................................................60

**Other Authorities**

Sixth Cir. Pat. Jur. Inst. 10.04(2) ........................................................44

**STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Defendant-Appellant Edward Hills respectfully requests oral argument.  This case involves numerous significant issues pertaining to RICO conspiracy law, Hobbs Act honest services fraud, and sentencing.  Appellant submits that oral argument would assist the Court in arriving at a just determination of those issue.

The District Court has jurisdiction in these cases pursuant to Sections 371 and 1341 of Title 18 of the United States Code.

On October 19, 2016, the Defendant, Edward Hills, was indicted on one count of Racketeering in Corrupt Organizations Conspiracy, in violation of 18 U.S.C. §1962(d); one count of Conspiracy to Commit Hobbs Act Bribery, in violation of 18 U.S.C. §1951; one count of Conspiracy to Commit Honest Services and Money and Property Mail and Wire Fraud, in violation of 18 U.S.C. §1349; four counts of Money and Property Mail Fraud, in violation of 18 U.S.C. §1341 and 1342; one count of Conspiracy to Solicit, Receive, Offer, and Pay Health Care Kickbacks, in violation of 18 U.S.C. §371; seven counts of Receipt of Kickbacks in Connection with a Federal Health Care Program, in violation of 42 U.S.C. §1320a-7b(b)(1)(A); one count of Conspiracy to Commit Honest Services And Money and Property Mail and Wire Fraud, in violation of 18 U.S.C. §1349; one count of Conspiracy to Obstruct Justice and Tamper with Witnesses, in violation of 18 U.S.C. §1512(k); and three counts of False Statements on Tax Returns, in violation of 26 U.S.C. §7206(1). Indictment, RE 1, Page ID #1-93. The indictment also charged Sari Alqsous, Yazan Al-Madani, and Tariq Sayegh as co-conspirators on various counts.

On June 25, 2018, the case proceeded to trial.  One month later, on July 27, 2018, the jury returned a verdict of guilty on all counts against Mr. Hills, Mr. Al-Madani, and Mr. Sayegh, and on all but two counts against Mr. Alqsous.  Jury Verdicts, RE 337, Page ID# 5741-5760.  On April 13, 2019, the district court sentenced Mr. Hills to a term of imprisonment of 188 months.  Judgment Entry, RE 489, Page ID #20045-20051.

On April 23, 2019, Mr. Hills filed a Notice of Appeal from the Judgment Entry with this Court.  Notice of Appeal, RE 497, Page ID #20077-20078.

This Court has jurisdiction over this appeal of the District Court's final judgment and order pursuant to Section 1291 of Title 28 of the United States Code, which states in relevant part that "the courts of appeals … shall have jurisdiction of appeals from all final decisions of the district courts of the United States …"

I.  Whether the district court erred in denying Appellant's Rule 29 Motion, as there was insufficient evidence of Appellant's guilt of the RICO conspiracy charges and substantive counts.

II.  Whether the district court erred in denying Appellant's Rule 29 Motion, as there was insufficient evidence of Appellant's guilt of the Hobbs Act conspiracy charge and substantive counts.

III.  Whether the district court erred in its jury instructions on Hobbs Act conspiracy, honest services fraud, and public official status, and in failing to give a "good faith" instruction.

IV.  Whether the district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss, and in its order of restitution.

**Background.**  By all accounts, Edward Hills enjoyed a meteoric rise in his career.  Joining MetroHealth Hospital ("Metro") as resident in dentistry in 1993, he became the top-producing resident and shortly after that became chair of the dentistry department, prompting Daniel K. Lewis, the executive in residence at Metro and the government's first witness, to concede, "I don't know any other examples of that happening that quickly."  Transcript, RE 392, Page ID #9864-9865.  He continued as chairman until December 2014, and he produced results: the dentistry department was constantly in the black, one of the top earners in the hospital.  Transcript, RE 398, Page ID #13369.

But that was not the only role that Dr. Hills performed.  By 2007, Metro was suffering losses of $8 million per quarter.  Metro's CEO tasked Dr. Hills with leading a systemwide campaign to increase revenue; over the next 18 months, Dr. Hills' changes resulted in an $89 million dollar net gain.  Sentencing Memorandum, RE 451, Page ID #18397.

The following year, Metro named Dr. Hills the interim COO of the hospital system, and made that designation permanent later that year.  Dr. Hills also served as interim Chief Executive Officer at Metro from 2013 until his departure.  Transcript, RE 92, Page ID #9872.   During Dr. Hills' tenure in those roles,

Metro's net revenues rose by $300 million, surgery volumes increased 31%, and outpatient visits increased 30%, to over a million visits annually. Sentencing Memorandum, RE 451, Page ID #18398.

Among the other dentists working in the department during Hills' tenure were Sari Alsqous, Al-Madani, and Tari Sayegh.

On October 19, 2016, a Federal grand jury returned an indictment against Hills, Alsqous, Al-Madani, and Sayegh,[1] alleging that the four engaged in a variety of schemes by which Metro had suffered a loss of approximately one million dollars. Indictment, RE 1, Page ID #1-93

**A summary of the government's case.** Many of the counts involving Hills were duplicative. Basically, the government alleged that Hills received substantial benefits from Alsqous, Al-Madani, and others in the dental department, which were in essence bribes for his favorable treatment of them. The benefits included cash payments at dinners and buying expensive gifts such as a $3800 Louis Vitton briefcase and a large-screen television. Transcript, RE 401, Page ID #12514; RE 405, Page ID #13604-07. It also included payments to Hills' girlfriend, Joyce

---

[1]  Sayegh was charged and convicted of counts which did not involve Hills. He did not appeal, and will not be mentioned further.

Kennedy, in the form of the purchase of a laptop for her and the payment of rent at a downtown apartment. Transcript, RE 401, Page ID #12532, 12825-28. (Whatever the truth of Kennedy's statement on this and other matters, there was no question about her motives; prior to talking to the FBI, she told Hills, "If the feds tell me about another bitch, I'm going to ruin your fucking life." *Id*., Page ID #12579.)

Special Agent Kirk Spielmaker also testified to several deposits purportedly made by Alsqous in Dr. Hills' bank account, at a branch on the west side of Cleveland, approximately forty minutes from the east side of the city, where Dr. Hills lived. See, e.g., Transcript, RE 403, Page ID #12880-83; 12885; 12893. On cross-examination, SA Spielmaker conceded that Sharon Brown, who lived with Hills, worked as a school teacher across the street from the bank branch where the money was deposited, and that he never found withdrawals from Alqsous' account which corresponded to deposits into Hills' accounts. Transcript, RE 403, Page ID #12961, 12967.

Of course, none of this in itself was illegal. While Metro policy prohibited its personnel from accepting gifts from patients, vendors, or contractors, there was no prohibition on giving gifts to other employees. Transcript, RE 392, Page ID #9878-79. A crime would occur only if the gifts were tantamount to a bribe: that

in return for the gifts, Hills did something illegal that harmed Metro. The *quid* for this *quo*, according to the government, came in a variety of forms.

**Dental Residency Bribery**. The government alleged here that Alqsous, Al-Madani, and Sayegh were involved in a scheme whereby they procured bribes from various dental students to secure a residency in Metro's dental department. The government did not allege that Hills had any involvement in this scheme.[2]

There was another aspect to this charge, though. Loiy Al-Shami, a dentist at Metro, testified that in December of 2013 he participated in an interview panel for residents that were applying to start the following summer. There were three spots available, and one of the people interviewed was Lutfi Nassar. After the interview, Alqsous came to him and inquired how Nassar had done in the interview. Transcript, RE 402, Page ID #12709-12.

Nassar had not finished in the top three.[3] Al-Shami overheard Dr. Hills talking with Alqsous and Dr. Hussein Elrawy and telling them to "take Sari's boy."

_____

[2]  This was the basis for the only charges against Sayegh. He will not be mentioned further.

[3]  Actually, as explained *infra,* he had been the high scorer. He was not ranked in the top three due to a scoring error.

Transcript, RE 402, Page ID #12713-14.  Elrawy testified that Dr. Hills told him to open another spot, and Nasser was selected to fill it.  Transcript, RE 405, Page ID #13681.  Elrawy, who would be the government's star witness, conceded that Nassar was "a very good dentist, really qualified person."  *Id.* at 13684.  While the government alleged that Metro suffered over $100,000 of loss due to paying Nassar's salary, no evidence was introduced as to how much money he earned for Metro during his tenure.  The allegation regarding Nassar formed one of the bases for the RICO conspiracy in Count 1, and the Hobbs Act conspiracy charge in Count 2.

  **Increases to Incentives.**  Doctors at Metro weren't forty-hour-a-week employees, required only to put in eight hours from Monday through Friday; as Dr. Alfred Connors, who served as Chief Medical Officer, explained, the average doctor or dentist worked 55 to 60 hours a week.  Transcript, RE 403, Page ID #13375.  To compensate them properly, various departments, including Dentistry, adopted an incentive program:  the dentist would receive an incentive based on his productivity, but the incentive would kick in only when Metro had clawed back all of the money it had paid the dentist in salary and benefits.  The dentist would get a 25% bonus for whatever they made for Metro above what they cost in salary and benefits.  Transcript, RE 403, Page ID #13097-13098.

The department chair could also request that the incentives be adjusted, for example, in situations in which the dentist assumed additional administrative duties, or was covering for another doctor's shift. *Id.,* Page ID #13120; Transcript, RE 407, Page ID #14121. The chair did not have final say on this; any recommendation Hills made had to be signed off on by the Finance Department, and then approved by Connors. *Id.*

The government claimed, and the district court found, that Alsqous and Al-Madani had received $92,829 in upward adjustments of their incentives. As will be shown *infra*, that figure resulted from cherry picking the dates and figures. Over the period of time covered by the indictment, Alsqous' adjustments came from covering for another dentist. *Id.*, Page ID #14159-61. Hills actually adjusted the incentives for Al-Madani *downward*. *Id.*, Page ID #14175-14186.

These allegations were charged as part of the RICO conspiracy and the Hobbs Act conspiracy in Counts 1 and 2.

**Dental Patient Referral and Bribery.** At a meeting of the dental department in March of 2014, Dr. Hills announced that it was permissible to refer certain Metro patients to Buckeye Dental Clinic. Transcript, RE 399, Page ID #12014. Al-Madani had signed an application for Buckeye Dental to be a provider of Medicaid. Transcript, RE 394, Page ID #10381. It was the government's

theory that part of the stream of benefits to Hills was a "kickback" for the referrals. The government also claimed that Hills had received direct payments from Buckeye for this, labeled as "consultant fees." Those fees, however, started in December of 2013, four months before the March meeting.

The evidence showed that the referrals were actually prompted by a substantial overflow in dental patients as a result of the institution of the Care Plus program. Transcript, RE 392, Page ID #9883. Numerous witnesses testified that patients were lined up outside the dental clinic, and would get angry and upset about not being treated. Transcript, RE 399, Page ID #12015, 12020; RE 400, Page ID #12234-35; RE 402, Page ID #12678. The government could not produce a single person who had been referred from Metro to Buckeye Dental. Transcript, RE 407, Page ID #14001; RE 404, Page ID #13420.

The government alleged that the stream of benefits and cash payments to Hills constituted kickbacks, and was part of the RICO conspiracy, the Hobbs Act conspiracy, and the conspiracy to solicit and receive health care kickbacks charged in Counts 1, 2, and 13.

**Free Labor Scheme.** Chan Wang testified that she managed her husband's dental office, Noble Dental Care, starting in 2002. Transcript, RE 399, Page ID #11884. She met with Dr. Hills in 2006 when she was trying to sell the

practice, and proposed an agreement that would have him provide her with dentists; the agreement was never signed. *Id.*, Page ID #11887-88, 11901. Nonetheless, Wang did make payments to Hills, at his request making some of the checks payable to Oral Health Enrichment. *Id.* Page ID #11900, 11909. (There is no dispute, though, that Hills worked there himself, so payments to him would hardly have been unusual.)

Al-Madani, Alqsous, and Bogdan Butriy, another dentist at Metro, did perform work at Noble Dental; Wang knew they were employees of Metro. *Id.*, Page ID #11914, 11917.

It was not unusual, however, for dentists at Metro to work at private dental clinics, and numerous ones besides Al-Madani and Alqsous did. Transcript, RE 400, Page ID #12129-30. Hills had introduced a Flextime policy for the dental department, which required dentist to work forty hours a week, but at unspecified times; they were eligible to take advantage of the policy so long as they came in on the days they worked by 7:00 A.M. and left no earlier than 6:00 P.M. *Id.*, Page ID #12109, 12129. As long as the dentists worked forty hours a week, they were free to work at another clinic. *Id.*, Page ID #12132.

The government alleged that the cash payments to Hills constituted kickbacks, and was part of the RICO conspiracy, the Hobbs Act conspiracy, and

12

the conspiracy to solicit and receive health care kickbacks charged in Counts 1, 2, and 13. The checks paid by Noble Dental to Hills or Oral Health Enrichment served as the basis of the substantive counts of kickbacks regarding a Federal Health Care program charged in Counts 14 through 20.

   **Ohio Heath Enrichment.** In late 2008, Dr. Hills entered into an enterprise with Julie Solooki to form an LLC known as Oral Health Enrichment. Transcript, RE 401, Page ID #12293-95. The purpose of the venture was to provide remediation services to dentist who had had their license revoked or suspended for various reasons. Solooki was to handle the business side, and Dr. Hills the clinical side. *Id.*, Page ID #12296. Essentially, OHE would provide educational training materials and, if necessary, clinical assessments, to dentists to allow them to regain their licenses. Approximately 80% to 85% of the cases involved only the provision of study materials; clinical assessment was rare. *Id.*, Page ID #12381. Over the five-year period during which Oral Health Enrichment was in operation, the government could produce evidence of only nine dentists who had undergone the clinical remediation at Metro, paying OHE a total of $13,000 for those services. (This evidence was summarized in the Sentencing Memorandum, RE 451, Page ID #18407, fn. 3. That will be set forth more fully in the argument portion of this Brief.)

The government offered several witnesses who had procured the services of OHE. One of them was Charles Akin, a dentist in Texas, who had lost his license and spent five years in prison after being convicted of Medicare fraud. Transcript, RE 398, Page ID #11553, 11597. He paid $12,000 to OHE, then came up to Cleveland and did the clinical portion of the exam at Metro. *Id.*, Page ID #11554, 11566. He was charged extra money for the clinical portion, and after two years, decided that he'd been "snookered" and wrote a letter of complaint to Metro. *Id.*, page ID #11572-74.

Michael Phillips was the chief legal officer at Metro, and received Akin's letter. Transcript, RE 397, Page ID #11780-81; EX 2401. He had never heard of OHE before this, and confronted Dr. Hills about it. *Id.*, Page ID #11786-87. Dr. Hills did not use Metro after that. Transcript, RE 401, Page ID #12410.

The government's allegations regarding Oral Health Enrichment served as the basis for the RICO conspiracy charged in Count 1, and the conspiracy to commit money & property mail and wire fraud in Count 8, as well as the substantive counts for money and property mail fraud in Counts 9 through 12.

**Attorney Scheme.** Anthony Jordan received dental work from Metro for which he was not billed. Transcript, RE 399, Page ID #11833-34. The government alleged that this was authorized by Dr. Hills in return for Jordan's

representation in a case involving Dr. Hills' dispute with a homeowner's association.  Transcript, RE 408, Page ID #14344.

Dr. Connor acknowledged that a number of dentists treated family members for free.  Transcript, RE 404, Page ID #13242.  Furthermore, Metro in certain cases would not bill for treatment when it was highly specialized; after all, Metro also served as a teaching hospital, and could write off treatment for an "educational case."  Transcript, RE 404, Page ID #13237; RE 399, Page ID #11824-25.  That was precisely what was called for in Jordan's case; in fact, he had previously been treated as a teaching case at Case Western Reserve and Harvard University.  *Id.*, Page ID #11847.

The treatment of Anthony Jordan was charged as part of the RICO conspiracy in Count 1.

**Obstruction of Justice.**  Jerry Kimble worked for the Ohio Dental Board as an investigator.  Transcript, RE 408, Page ID #14250.  On January 21, 2015, he received a voicemail stating that Hills' office had been raided by the FBI, and that Hills had been arrested.  *Id.*, Page ID #14252-53.  Neither of those claims were true.

Kimble informed the director of the board, Lili Reitz, of the call, and was told to determine who the caller was.  *Id.*, Page ID 14254-56.  He initially

concluded that the caller was a dentist by the name of Alexander DiFilippo, and informed Reitz, who in turn provided that information to Hills. *Id.*, Page ID #14256-57, 14259-14262. Dr. DiFilippo subsequently received a "cease-and-desist" letter from Larry Zukerman, a lawyer for Hills. Transcript, RE 409, Page ID #14492-94. Kimble subsequently determined that the call to the board had been made by someone else. Transcript, RE 408, Page ID #14269.

All of this was received over objection by defense counsel. The 93-page indictment made no mention of it.

Most of the evidence regarding obstruction was provided by Hussein Elrawy, who also worked as a dentist at Metro, and was closely involved with Hills, Alqsous, and Al-Madany. He learned of the investigation into the dental department in the summer of 2014. Transcript, RE 407, Page ID #13757. Special Agent Spielmaker contacted him in October, and the two met on seven or eight occasions, with Elrawy agreeing to cooperate at the first meeting. *Id.*, Page ID #13758-59.

According to Elrawy, Hills instructed him to tell the FBI that the referrals to Buckeye Dental were for Care Plus, so only Metro would be paid, although he initially told the FBI that he had no idea why Hills would refer patients to Metro, and that there was no financial relationship between Hills, Al-Madani, and

Alqsous.  *Id.*, Page ID #13769, 13859.  Elrawy also testified that Hills instructed

Elrawy, Al-Madani, and Alqsous to "stick together, don't talk to the FBI, say we

don't know anything."  *Id.*, Page ID #13769, 13818-19.  He further testified that

Hills had instructed him to tell the FBI that the money Hills received from Noble

Dental Clinic was the repayment of a loan.  *Id.*, Page ID #13770.

At Spielmaker's request, Elrawy even recorded a meeting at Red Steakhouse

in November of 2014, at which Al-Madani and Alqsous were also present.  *Id.*,

Page ID #13796.  (Elrawy claimed that Hills patted him down three times at the

meeting before speaking to him; there was no evidence of the patdowns on the

recording.  *Id.*, Page ID #13805, 13855.)  At the meeting, Hills told the others,

"you all need to work like a cartel, understand the business, you guys will be great,

but do it legally.  How many times have I told you guys sitting right here you're

never bigger than the game."  *Id.*, Page ID #13890.

Other elements of Elrawy's version of what happened evolved over time.  In

February of 2015, he told the FBI that Hills never asked him to give cash; a month

later, he told them that Hills did.  *Id.*, Page ID #13857-58.  It was not until that

February meeting, the eighth time that he had been asked about it, that Elrawy told

the FBI about the Luis Vitton bag and the big-screen TV.  *Id.*, Page ID #13856.

Elrawy told the FBI in October of 2014 that he was not aware of any financial

17

relationship between Hills, Alqsous, and Al-Madani; a month later he told them that Alqsous was negotiating with Hills on how much to pay Hills for sending patients to Buckeye. *Id.*, Page ID #13966-67.

The allegations regarding obstruction of justice were part of the RICO conspiracy in Count 1, and were separately charged as conspiracy to obstruct justice and tamper with witnesses in Count 29.

Counts 31 through 33 alleged that Hills had filed false statements on his tax returns by virtue of not including money he had received from Oral Health Enrichment and kickbacks for the past three years.

**The proceedings.** After several years of pretrial motions, the case finally went to trial on June 25, 2018. Hills moved for a Rule 29 dismissal at the close of the government's case, and at the close of all the evidence. Transcript, RE 410, Page ID #14830 and RE 411, Page ID #15161. The court denied the motions. RE 410, Page ID #14835, RE 411, Page ID #15166.

The case was then submitted to the jury, with objections to various instructions as detailed *infra*. The jury ultimately returned a verdict of guilty on all charges against Hills.

Hills returned for sentencing on April 10. After extended argument, the district court determined that Hills was a Criminal History Category 1, since he

had no prior convictions of any sort. It rejected all the objections the defense had made to the Guideline calculations, determined that the adjusted offense level was 40, then granted a four-level variance. This resulted in a sentencing range of 188-235 months. The district court sentenced Hills to 188 months and ordered him to pay a special assessment of $2,000. Judgment, RE 489, Page ID #20045-20051. On June 7, 2019, the district court entered a *nunc pro tunc* order directing Hills to pay restitution to Metro, jointly and severally with co-defendants Alsqous and Al-Madani, in the amount of the $916,841.88, and to pay restitution to the Internal Revenue Service of $80,426. Order, RE 515, Page ID #20241-42.

Hills timely appealed. Notice of Appeal, RE 497, Page ID #20077-78.

## SUMMARY OF ARGUMENT

There was insufficient evidence upon which to base convictions for conspiracy and fraud; the government failed to show that any of the alleged schemes were illegal or harmed Metro. The district court erred in its instructions on honest services fraud and official act and erred in refusing to give an instruction on good faith. The district court erred in its guideline calculation, making errors in the calculation of loss and the enhancements to Defendant's conduct, and erred in its order of restitution.

## LAW AND ARGUMENT

## I. The District Court erred in denying the motion for judgment of acquittal as to Counts 1, 8, 13, 14-20, and 29.

**A. Standard of Review.** A Rule 29 motion is a challenge to the sufficiency of the evidence. *United States v. Jones*, 102 F.3d 804, 807 (6th Cir. 1996). This court reviews the sufficiency of the evidence supporting a conviction "by determining 'whether after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Wang*, 222 F.3d 234, 237 (6th Cir. 2000).

**B. Count 1.** Count 1 charged Hills with conspiring to violate the RICO act under 18 U.S.C. 1962(d). That requires proof that the defendants constituted an enterprise which engaged in a pattern of racketeering activity. *United States v. Turkette*, 452 U.S. 576 (1981). A "pattern of racketeering activity" requires proof of two acts. That doesn't mean two *transactions*; conviction requires proof of two *schemes*. *Phoenix Fed. S&L Ass'n., F.A. v. Shearson Loeb Rhodes, Inc.*, 856 F.2d 1125 (8th Cir. 1988), cert. den. 489 U.S. 1066 (1989).

As noted, the government charged Hills with engaging in six separate schemes in the RICO conspiracy account. (The government asserted that the stream of benefits received by Hills was another scheme, but as indicated, that was

not illegal in itself; the government's argument was that the stream of benefits was essentially intended as a bribe for Hills to engage in the other schemes, to his benefit and that of the other defendants.) Conviction required them to prove at least two of them. The evidence was insufficient to convict him of any.

       **1. Dental residency bribery scheme.** The dental residents bribery allegation revolved around four residents who were hired by Metro: Ahmad AlSaad, Issa Salameh, Yazan Karadsheh, and Firas Yacoub. The government claimed that all four paid bribes to Alqsous and Al-Madani to gain admission to Metro's dental residency program. Those allegations were included as part of the RICO conspiracy count, and the amounts they paid formed the basis of the substantive charges in Counts 3 through 7.

       Hills was not charged in any of the latter counts, nor as part of the conspiracy as it pertained to AlSaad, Salameh, Kardsheh, and Yacoub. In fact, AlSaad never met Hills until after he started at Metro. Transcript, RE 393, Page ID #10021, 10043. Similarly, Yacoub had no conversations with Hills prior to his admission. Transcript, RE 394, Page ID #10453-10454, 10456. Salameh met Hills twice at dinners with numerous other people from Metro present, but the two only engaged in small talk; there was no discussion of Salameh paying a bribe to get

into program.  Transcript, RE 395, Page ID #10808-10.  Karadsheh was not asked any questions about Hills regarding the supposed bribery scheme.

But there was another resident the government claimed was part of that scheme, and did involve Hills:  Lufti Nassar.  Loiy Al-Shami, a dentist at Metro, testified that he was on an interview panel for dental residents applying in the summer of 2014.  Transcript, RE 402, Page ID #12709.  There were three slots available, and Nassar was one of the interviewees, but wasn't selected.  *Id.,* Page ID #12710, 12712.  Alsqous asked the interviewers about Nassar afterwards, and Al-Shami later overheard Hills telling Elrawy to "take Sari's boy."  Id., Page ID #12713.  Waleed Elmallah, another dentist at Metro, confirmed that Nassar had come in for the interview, but hadn't been chosen; then next day, a new position opened, and Nassar was selected.  Id., Page ID #12792.  Elrawy confirmed the same course of events. Transcript, RE 405, Page ID #13675-81.

But Elrawy also confirmed that there was a calculation error in Nassar's total score:  he actually scored the highest of the three people interviewed.  Transcript, RE 407, Paige ID #13953.

There are possible scenarios where the hiring of Nassar might be a crime, for example, if there were evidence that Nassar had paid a bribe to either Hills or Alsqous, or both, for favorable treatment.  But there was not even evidence of

23

favorable treatment. Even Elrawy, who certainly sought to do no favors to the defendants with his testimony, readily conceded that Nassar was a "very good dentist" and a "really qualified person," to the point where Elrawy made him the chief resident, and re-signed him to a contract of a second year, after Hills had left Metro. Transcript, RE 405, Page ID #13684.

And even if Nassar's hiring had shown favoritism, that is not a crime. But it did not even show that. There is no evidence that Hills was involved in the alleged bribery scheme involving the other residents, and no evidence that his involvement in Nassar's hiring constituted a crime. In short, even construing the government's evidence in the most favorable light, as this Court must do, there was no evidence that Hills was guilty of any part of the residency bribery scheme.

**2. Oral Health Enrichment scheme.** As noted, Hills' creation of the company called Oral Health Enrichment served as the basis for one of the schemes under the RICO count, as well as a separate conspiracy charge in Count 8, and substantive offenses in Counts 9 through 12. According to the government's telling, in doing so he defrauded Metro Health by using their facilities to conduct the clinical part of OHE's remediation program.

Exactly how he did so is difficult to determine. His materials made no mention of Metro. His use of Metro facilities was a very small portion of OHE's

activities – 85% of OHE's income came from the didactic examinations, in which Metro played no part, Transcript, RE 401, Page ID #12381 – and a very small part of Metro's as well. Joseph Walker's clinical exam at Metro took ten to fifteen minutes, and didn't involve any supplies from Metro. Transcript, RE 398, Page ID #11363. Stuart Katz was at Metro for three to four hours, and there were no patients present at the time. *Id.*, Page ID #11380-81. The work was not done on patients: mannequin heads and plastic teeth were used.

The treatment and payments for the doctors who received remediation at Metro can be summarized as follows:

- Dr. Katz: $14,000 for 140 continuing education hours; no clinical assessment billing

- Dr. Kennedy: $8,000 for 80 continuing education hours; $2,500 for clinical assessment

- Dr. Akin: $10,000 for 100 continuing education hours; $2,500 for clinical assessment

- Dr. Bower: $11,000 for 110 continuing education hours; $1,500 for clinical assessment

- Dr. Norden: $10,000 for 100 continuing education hours; $2,000 for clinical assessment

- Dr. Donley: $10,000 for 100 continuing education hours; $2,000 for clinical assessment

- Dr. Tillman: $2,400 for 24 continuing education hours; $500 for clinical assessment

- Dr. Abadi: $30,000 for 300 continuing education hours; $2,000 for clinical assessment

- Dr. Walker: $3,000 for continuing education hours; no clinical assessment billing.

Sentencing Memorandum, RE 451, Page ID #18407, fn. 3.

The total amount billed by OHE for the clinical assessments was $13,000, over a five-year period. There was no evidence that Metro suffered any loss whatsoever as a result of the few clinical examinations performed on their premises by Oral Health Enrichment. Absent any such proof, there was insufficient evidence to convict Hills of the conspiracy and substantive counts pertaining to that activity.

**3. Dental patient kickback scheme.** This was a central part of the government's case: it alleged that, in return for various gifts and payments, Hills steered patients from Metro to Buckeye Dental Clinic, which was operated by Alqsous and Al-Madani.

The government's case centered on a meeting of the Dentistry Department in March of 2014, where Hills announced that patients could be referred to Buckeye Dental Clinic, which was owned by Alsqous and Al-Madani. Transcript, RE 399,

Page ID #12000-01; RE 400, Page ID #12667.  In the government's telling, this was the classic quid pro quo arrangement:  in return for the "stream of benefits" provided to Hills by Al-Madani, and Alsqous, Hills would make sure that patients would be referred to Noble Dental, where Al-Madani and Alsqous would reap the rewards.

According to Elrawy, the announcement had its seed at a dinner meeting a few months earlier, when Hills supposedly proposed that the patients be referred and that the money be split three ways, with one-third going to Hills, one-third going to Elrawy, and one-third going to the Clinic.  Transcript, RE 406, Page ID #13742-43.  Elrawy was not the most credible source for this allegation; after several meetings with the FBI he was still insisting that he had no idea why patients would be referred to Buckeye, and that there was no financial relationship between Hills, Al-Madani, and Alsqous.  Transcript, RE 407, Page ID #13859.  In any event, Elrawy testified that the proposal never went anywhere.  Id., Page ID #13999.

But the remaining testimony of numerous other witnesses painted a substantially different picture of Hills' motivation for the proposed referrals.  In 2013, Metro had instituted the Care Plus Program, which was designed as a

demonstration project delivering services to Medicaid-eligible patients who had not received prior dental service. Transcript, RE 392, Page ID #9844-45.

However well-intentioned the program was, it resulted in an influx of patients that Metro was simply not prepared to handle. According to Daniel Lewis, the Executive in Residence who served under the CEO of Metro, adoption of the program led to an increase of 22% in the number of patients. *Id.*, Page ID #9884.

Lewis described this as a "big influx" which led to the dentistry department being "crowded." *Id.* Alfred Connors, the chief medical officer at the time, acknowledged that the waiting room was so full that there were people in the hallways waiting for treatment. Transcript, RE 404, Page ID #13466.

That was corroborated by people within the department. Thandeka Cox, who served as administrative supervisor for the department, testified that there had been an increase in the number of patient complaints, primarily about the volume of patients and the wait time in the department; it would not be uncommon for patients to be waiting for hours to be seen by a dentist, or for there to be so many patients in the department that there wouldn't be enough room for them to sit down. Transcript, RE 400, Page ID #12234-35. Vilma Timarchi, a dental assistant, told the jury that there would be patients lined up outside the clinic, and

that she felt relieved when told of the possibility of referring them. Transcript, RE 399, Page ID #12015.

This leads to the first of two fatal defects in the government's case: as Lewis acknowledged, a dentist could refer a patient outside of Metro for medically appropriate reasons, and Hills would have had the authority to refer patients out because of patient overload. Transcript, RE 392, Page ID #9884, 9903-08. The second was that none of the witnesses – not Connor, not Elrawy, not anyone – could point to a single patient who was referred out. Transcript, RE 404, Page ID #13420; RE 407, Page ID #14001.

The government's case on the dental patient kickback scheme hinged on their ability to show that what Hills did was improper, and that patients were actually referred out. It accomplished neither of these objectives. The government's proof here was insufficient as a matter of law.

    **4. Obstruction of justice.** The government charged Hills with of obstruction of justice, both as part of the RICO conspiracy in Count 1 and as separate charge of conspiracy in Count 29. The statute at issue, 18 U.S.C. §1512(b)[4], provides as follows:

---

[4]  Hills was indicted for conspiracy under §1512(k). Section 1512(b) would be the relevant section for the substantive offense.

(b) Whoever knowingly uses intimidation, threatens or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—

      (1) influence, delay or prevent the testimony of any person in an official proceeding;

      (2) cause or induce any person to—

            (A) withhold testimony, or withhold a record, document, or other object, from an official proceeding;

            (B) alter, destroy, mutilate, or conceal an object with intent to impair the object's integrity or availability for use in an official proceeding;

            (C) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or

            (D) be absent from an official proceeding to which such person has been summoned by legal process; or

      (3) hinder, delay, or prevent the communication to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, supervised release, parole, or release pending judicial proceedings;

      shall be fined under this title or imprisoned not more than 20 years, or both.

The first allegation raised by the government here involved a complaint received by the Ohio State Dental Board on January 21, 2015. According to Malynda Franks, a professional assistant to the Board, she received an anonymous

phone call on that date, claiming that Dr. Hills had been arrested and his office searched by the FBI. Transcript, RE 398, Page ID #11684. She informed Jeremy Kimble, an investigator for the Board, and he in turn relayed the information to his supervisor, Lili Reitz, who told him to gather information about the call. Transcript, RE 408, Page ID #14252-55.

Kimble initially identified the caller as Alexander DiFilippo, a dentist, based on a reverse number search. *Id.*, Page ID #14262. Kimble called DiFilippo and determined it could not have been him. *Id*., Page ID #14263-64. After further extensive efforts, Kimble was able to determine that the caller had actually been Pat Forkapa, a dentist professional in the Cleveland area. *Id.*, Page ID #14269.

On January 21, 2015, DiFilippo received a letter from Larry Zukerman, Hills' attorney at the time. Transcript, RE 409, Page ID #14491; Exhibit 8006. The letter advised DiFilippo that it had come to Zukerman's attention that "you have disseminated false spoken or written statements regarding Dr. Hills," and instructed him to "cease and desist from any further spoken and/or written defamatory statements regarding Dr. Hills." *Id*., Page ID #14493.

Ignoring for the moment that there was no mention of this in the 93-page indictment against Hills, how this would constitute the crime of obstruction of justice is impossible to discern. Even assuming that Hills' office had been

31

searched by the FBI and that he had been arrested – neither of which were true – there is no possibility that DiFilippo would have been able to testify at trial regarding that; his testimony would have been utterly irrelevant. Under the most liberal interpretation of §1512, any actions taken by Hills with respect to DiFilippo could not have constituted a crime.

The government fares no better with its second theory of obstruction: Hussein Elrawy's testimony that Hills told him and Al-Madani and Alqsous to "stick together, don't talk to the FBI, say we don't know anything." Transcript, RE 407, Page ID #13818-19.

The government's case glides over the fact that Hills can clearly be heard on the surreptitiously-recorded tape at the Red Steakhouse dinner in November of 2014 telling the others, "do it legally." Transcript, RE 407, Page ID #13891. Furthermore, as the court explained in *United States v. Farrell*, 126 F.3d 484 (3rd Cir. 1997), simply telling co-defendants to exercise their Fifth Amendment rights does not constitute "corruptly" persuading within the meaning of §1512.

In that case, Farrell had been charged with conspiracy to sell adulterated meat, and told the purchaser not to cooperate with the USDA investigators. He was then charged and convicted of a §1512 violation.

On appeal, the court agreed that the term "corruptly persuades … cannot mean simply 'persuades with the intent to hinder communication to law enforcement' because such an interpretation would render the word 'corruptly'" meaningless. The court concluded that the term "does not include a non-coercive attempt to persuade a conspirator who enjoys a Fifth Amendment right not to disclose self-incriminating information about the conspiracy to refrain, in accordance with that right, from volunteering information to investigators." F.3d at 488. See also *United States v. Doss,* 630 F.3d 1181 (9th Cir. 2011) (no violation when defendant told wife to assert her marital privilege to not testify against him).

To be sure, this does not exempt a defendant of culpability from telling a witness, even a co-conspirator, to provide false information. *United States v. Hull*, 456 F.3d 133 (3rd Cir. 2005); *United States v. Pennington*, 168 F.3d 1060 (8th Cir. 1999). But that was not what happened here. At worst, Hills simply exhorted his colleagues to exercise their Fifth Amendment rights and not cooperate with the investigation. That is not a crime, and the evidence of obstruction under both Count 1 and Count 29 was insufficient for conviction.

**5. Attorney Scheme.** There is no question that Anthony Jordan, who served as Hills' lawyer in a civil matter on one occasion, had extensive treatment at

Metro for his dental problems, and was not charged by Metro for the treatment. Transcript, RE 399, Page ID #11820-21, 11833-34, Exhibit 7008.

It must be kept in mind that Metro is not merely a hospital, it is also an academic medical center for several hundred medical and dental residents. For that reason, complex clinical cases would often be classified as educational cases to allow residents to satisfy their academic requirements. In those cases, fees would be waived for the patient.

Jordan had a "very unique, very complex" dental situation, Transcript, RE 399, Page ID #11846, and Metro had a process for determining whether some treatment was so complex that it would not charge for it, because it could be used as a training tool for residents. Transcript, RE 404, Page ID #13237. Dr. Hills told Bogdan Butriy, who performed most of the work on Jordan, to write it off as an "educational case." *Id.*, Page ID #11824-25. Butriy acknowledged that younger residents watched his work on Jordan, and was not aware that Jordan had previously been treated as a teaching case at Case Western Reserve and Harvard University. *Id.*, Page ID #11847.

**6. Free labor at Noble Dental Clinic.** The government's theory here was that Hills was paid by Noble Dental Clinic to provide dentists for the clinic, and did so by having Alsqous and Al-Madani work there. As explained earlier,

34

however, there were no fixed schedules for residents at Metro due to the implementation of the Flextime policy; so long as a dentist put in his required forty hours a week, regardless of which days he worked, he was free to work outside of Metro.  Transcript, RE 400, Page ID #12132.

It would have been simple for the government to prove its allegations:  all it would have to do was present a single witness or a single exhibit to show that Alsqous or Al-Madani was working at Noble Dental at the same time he was supposed to be working at Metro, and was getting paid by Metro.  The government presented no fewer than 44 witnesses and introduced approximately 2,000 exhibits.  Not one of them proved what the government claimed.

The government provided no evidence that Alqsous or Al-Madani worked at Noble Dental Clinic at times they were getting paid to work at Metro, and without that evidence, the district erred by not granting a judgment of acquittal.


## II.  The District Court erred in denying the motion for judgment of acquittal as to Count 2.

**A.  Standard of Review.**  The standard of review for a district court's decision denying a motion for judgment of acquittal has been previously set forth.

**B.  The incentives and the stream of benefits.**  Count 2 charged Hills with Hobbs Act bribery.  To a certain extent, the allegations here overlapped with those

in the RICO count:  the hiring of Lufti Nassar and the allegations of free Metro labor being provided to Noble Dental were part of that count, and have been dealt with *supra*.

The central claim under the Hobbs Act count was that the other defendants plied Hills with gifts and money, and in return he increased their salaries.  As explained earlier, the dental department operated under an incentive program: once dentists had "paid back" what they had received in salary and benefits, they would receive 25% of whatever excess they had earned for the hospital. Transcript, RE 403, Page ID #13097-98.  There was nothing improper about this. The 25% formula had been adopted in the dental department in 2008.  Transcript, RE 408, Page ID #14235.  A number of other departments operated on an incentive basis, and Connors, upon taking over as Chief Medical Officer in 2009, left the incentive program for the dental department in place.  Transcript, RE 403, Page ID #13118.

The government honed in on the fact that not only did Alsqous and Al-Madani receive incentives, they received adjustments to the incentives.  That in itself was not illegal, either – Connor signed off on the adjustments, and in fact on several occasions persuaded Hills to make a smaller adjustment, *Id*., Page ID #13120 – but it allowed the government to further its narrative of nefarious

dealings between Hills and Alsqous and Al-Madani. The government's testimony on that is encapsulated in the chart in the indictment, showing that Al-Madani, Elwrawy, and Alsqous received a total of $92,829 in "extra incentives" between December 2012 and October 2014. Indictment, RE 1, Page ID #43; see also PSR, RE 366 *SEALED*, Page ID #8755, ¶27.

But the careful observer will note that there are large gaps in the chart. Al-Madani received an upward adjustment in January of 2013, but did not receive another one until August of 2014; of the thirty-seven months between the first upward adjust in December 2012 until Hills retired in 2014, Al-Madani received an upward adjustment in only four of them. Alsqous fared better, but only slightly so: he received upward adjustments in eight of the thirty-seven months, the last in July of 2013.

That Alsqous and Al-Madani received no upward adjustments during most of this period would ordinarily be of little relevance. It takes on great significance, however, because the evidence clearly shows that their incentives were adjusted downward in many months, to the point where during the time period they actually received less in incentives than the Metro policy would have allowed them.

The reason Alsqous fared better was because he was coming in on his off-days to fill in for Dr. Kirlough; the incentives were reduced for Kirlough, and

given instead to Alsqous.  Transcript, RE 408, Page ID #14152-14158.  After

Kirlough left the hospital in July of 2013, Alsqous never received any upward

adjustments to his incentives.  *Id*., Page ID #14157-14158.  Notably, even Connor

agreed that Alqsous was "very productive" and had to be hardworking "to generate

the amount of revenue he was generating."  Transcript, RE 404, Page ID #13372.

Al-Madani fared even worse.  For 2011, a period before the chart, he

received upward adjustments of $4,210, and downward adjustments of $4,556.

Transcript, RE 408, Page ID #14169-74.  As noted, Al-Madani received a single

payment in 2013.  In 2014, he again received a downward adjustment:  while he

did receive upward adjustments of $1,999, $1,499, and $2,378, he received

downward adjustments of $9,489 and $3,692; in 2014, he received $7,305 less than

his actual incentives.  *Id*., Page ID #14186.

The government's case on Hobbs Act conspiracy hinged on showing that

Alsqous and Al-Madani transferred money or goods to Hills in return for receiving

salary increases they were otherwise not entitled to.  The complete failure of the

government to show the latter point warranted dismissal of this count.

**C.  The reduction in work hours.**  The second part of the government's

case of a Hobbs Act conspiracy centered around the claim that in return for the

payments to Hills, Hills permitted Alsqous and Al-Madani to work part-time

instead of full-time, thus allowing them to work at Noble Dental Clinic. This argument has been previously addressed.

**D. The official act requirement of Hobbs Act conspiracy.** The Supreme Court's decision in *McDonnell v. United States*, 136 S.Ct. 2355 (2016), substantially increased the requirements for conviction of Hobbs Act conspiracy. As this Circuit has recognized, under *McDonnell*, an "official act" is no longer simply every action a public official takes in the course of their employment, but it only includes a smaller realm of conduct, it is now limited to "…a decision or action on a 'question, matter, cause, suit, proceeding or controversy'… [that] must involve a formal exercise of government power that is similar in nature to a lawsuit before a court [or] a determination before an agency…" *United States v. Lee*, 919 F.3d 340, 358 (6th Cir. 2019) (citing *McDonnell*).

The first step in the Hobbs Act public official inquiry is to evaluate whether there was a question or decision pending before a public official. 18 U.S.C. § 203 (a)(3). The second step is to determine whether the public official took a decision or action on that pending question. In *McDonnell* the Supreme Court held that the official action or decision must be "something more" than setting up a meeting, hosting an event, or calling another official in order to advance a public policy initiative as a state politician (the governor of Virginia). 136 S. Ct. at 2359. Thus in

*McDonnell* where the Governor of Virginia set up meetings, hosted an event, called other government officials to lobby on behalf of a public policy, and bribes as consideration, the Supreme Court held those were not official acts.

The co-conspirators' conduct here did not meet the heightened standard of "official act" required by *McDonnell*. It was the regular course of business at Metro to pay bonus payments for exemplary work performance. The bonuses were paid based on a pre-established formula, approved via a regular and standard office procedure, and they were input and approved by Dr. Connor and signed-off by Cindy Meehan, not Dr. Edward Hills or anyone else in the alleged conspiracy. Transcript, RE 407, Page ID # 14091-94.

The payment of these regularly-issued bonuses was not an official act that amounts to criminal conduct. The Court's concern about improperly interfering with this ancillary job function was crucial to the reasoning in *McDonnell*. (Stating "…But conscientious public officials arrange meetings for constituents, contact other officials on their behalf, and include them in events all the time.") 136 S. Ct. at 2372. Therefore, the ancillary conduct of paying normal and standard-issued bonuses cannot be construed as an official act in the first place, because it is not a "decision or action on a 'question, matter, cause, suit, proceeding or controversy." As in McDonnell, receiving a bonus payment for exemplary work was just a

normal part of the job. As a matter of law there was insufficient evidence to prove the conspiracy charges alleged in the Indictment.

Finally, just because the defendants in this case worked for a public county-owned hospital as Dentists does not mean they are comparable to elected public officials as in *United States v. Lee*, 919 F.3d 340, 358 (6th Cir. 2019). Even Hills, who was interim CEO and COO of Metro during the relevant timeframe, was not elected by a public body; he was simply a dentist who performed executive duties. Hills did not even have the power to unilaterally issue the order that patients be referred to Dr. Alqsous' clinic – Buckeye Dental Clinic – because he had to seek approval from board members and higher executives in the chain of command. Transcript, RE 392, Page ID # 9919-20. Even though Metro was created by Ohio statute, *id*., Page ID # 9805, and the Trustees of the Board are ratified after their nomination by the county legislature and Ohio judges, that does not mean that Hills was to comparable to an elected official, especially considering that none of the acts charged against him involved his role as COO or interim CEO of the hospital.

**III. The district court erred in its jury instructions on Hobbs Act conspiracy by refusing to give an instruction on a requirement that there be an overt act.**

**A. Standard of review.** The failure to instruct the jury on an element of the offense is subject to de novo review. *United States v. Miner*, 774 F.3d 336 (6th Cir. 2014); *United States v. Vela*, 624 F.3d 1148, 1154 (9th Cir. 2010).

**B. The jury instruction.** Over objection, the district court did not include within its instructions to the jury the requirement that they must find that at least one of the overt acts alleged in the commission of the Hobbs Act conspiracy must be proven beyond a reasonable doubt. Jury Instructions, RE 360, Page ID #8300.

In *United States v. Benton*, 852 F.2d 1456 (6th Cir. 1988), this Court addressed the issue in the context of a double jeopardy analysis that required this Court to determine if acquittal of the defendant for conspiracy to distribute drugs precluded trying the defendant for a Hobbs Act conspiracy (on which the jury had previously been unable to reach a verdict). In concluding that double jeopardy did not apply this Court premised its decision, in substantial part, on the conclusion that, unlike a drug conspiracy under 21 U.S.C. §846, "conspiracy to violate 18 U.S.C. § 1951 does require proof of an overt act." *Benton*, at 1465.

The district court's failure in this regard constitutes reversible error. *Hoover v. Garfield Heights Municipal Court*, 802 F.2d 168, 177 (6th Cir. 1986) ("when an

42

instruction prevents the jury from considering a material issue, it is equivalent to a directed verdict on that issue and therefore cannot be considered harmless.").

Hills recognizes this Court has also stated in *United States v. Miner*, 774 F.3d 336 (6th Cir. 2014), that harmless error analysis can be applied in this situation, thereby precluding reversal if it can be shown beyond a reasonable doubt that the jury's verdict was unaffected by the error. *Id.* This Court is asked to follow *Hoover* in this regard. This Court should refrain from weighing the evidence itself in this regard – such a procedure substitutes the court's judgment for the non-existent judgment of the jury, in violation of the Sixth Amendment right to trial by jury. See *Carella v. California*, 491 U.S. 263 (1989) (Scalia, J., joined by Brennan Marshall, Blackmun, JJ., concurring in part).

Moreover, under a harmless error analysis, the conviction must still be reversed.


IV.    **The district court erred when it failed to instruct the jury that actions taken in "good faith" are not done with an intent to defraud.**

All defendants requested that the jury be instructed that actions taken in "good faith" are not done with an intent to defraud.  This Court's standard jury instruction, 10.04, entitled " 10.04 FRAUD -- GOOD FAITH DEFENSE," makes clear for a jury that  "[a]n honest mistake in judgment or an honest error in

43

management does not rise to the level of criminal conduct." Sixth Cir. Pat. Jur. Inst. 10.04(2). In the instant case, the jury was instructed on the concept of an intent to defraud but was not instructed on how good faith was antithetical to an intent to defraud:

> *Charging the jury that a finding of specific intent to defraud is required for conviction*, while it may generally constitute the negative instruction, i.e., that, if the defendants acted in good faith, they could not have had the specific intent to defraud required for conviction, *does not direct the jury's attention to the defense of good faith with sufficient specificity to avoid reversible error*.

*United States v. McGuire,* 744 F.2d 1197 (6th Cir. 1984), quoting *United States v. Goss*, 650 F.2d 1336, 1345 (5th Cir.1981) (emphasis in *McGuire*).

Here, the absence of the good faith instruction permeated every count in the trial. There was ample evidence by which a jury could have determined that Hills' adjustment to the incentives for Alsqous were motivated by extra administrative duties that Alsqous had assumed, as well as his filling in for Kirlough. There was ample evidence by which a jury could have determined that Hills' direction that Care Plus patients could be referred to Buckeye Dental Clinic because of the severe overflow in patients that program caused to Metro; the jury should have been instructed that good faith decision making in this regard was inconsistent with an intent to defraud.

44

In the end, in a case where the defendants maintained that they always acted consistently with what they perceived to be their responsibilities as Metro employees, the absence of a good faith instruction causes the jury instructions as to each count (except the conspiracy to obstruct justice and the false statement) to be inadequate. The affected counts should be reversed and remanded for a new trial.

## V.   The district court erred in defining the term "official act"

The district court's instruction on the term "official act," which related to Counts 2, 8, 9 through 12, and 28, was erroneous in both how it defined "official act" and how it defined the constituent term "public official."

The following instructions were given:

"Official act" means any decision or action on any question, matter, cause, suit, proceeding, or controversy which may at any time be pending or which may by law be brought before any public official in such public official's official capacity or in such official's place of trust or profit. This definition of official act has two parts.

First, the evidence must show a question, matter, cause, suit, proceeding, or controversy that may at any time be pending or may by law be brought before a public official. A "question, matter, cause, suit, proceeding, or controversy" must involve a formal exercise of governmental power and must be something specific and focused. Second, the government must prove that the public official made a decision or took an action on that question or matter or agreed to do so. The decision or action may include using an official position to exert pressure on another official to perform an official act.

Under this definition, setting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an official act.

The defendant need not have a direct role in the official act. An indirect role is sufficient. Actual authority over the end result is not controlling…

Transcript, RE 412, Page ID # 15270-71].

The term "public official" means a person with a formal employment relationship with government […] …

*Id.,* Page ID # 15270].

Both of these definitions were incorrect.

For purposes of the Hobbs Act and honest-services fraud, an official act does not include the broad spectrum of everyday decision-making that the instruction in this case suggests. To the contrary, official acts under the Hobbs Act "must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee." *United States v. Van Buren*, 940 F.3d 1192 (11th Cir. 2019) (vacating a conviction for honest-services-fraud and remanding for a new trial on that charge.).

"an 'official act' [under the Hobbs Act] is a decision or action on a 'question, matter, cause, suit, proceeding or controversy'… [that] must involve a formal exercise of government power that is similar in nature to a lawsuit before a court [or] a determination before an agency…")

46

*United States v. Lee*, 919 F.3d 340, 358 (6th Cir. 2019) (citing *McDonnell*).

Similarly, a public official under the Hobbs Act does not include everyone who has a "formal employment relationship" with the government, as the district court instructed the jury. Rather, for purposes of the Hobbs Act and honest services fraud:

> "(1) the term 'public official' means Member of Congress, Delegate, or Resident Commissioner, either before or after such official has qualified, or an officer or employee or person acting for or on behalf of the United States, or any department, agency or branch of Government thereof, including the District of Columbia, in any official function, under or by authority of any such department, agency, or branch of Government, or a juror."

18 U.S.C.S. § 201(a)(3); *McDonnell,*

It has already been argued, *supra*, that the failure of proof of "official act" and "public official" causes the Hobbs Act conspiracy, bribery and honest services fraud counts to be insufficiently supported by the evidence. Those arguments are incorporated herein to demonstrate the prejudicial nature of the error in the district court's instruction as to these two critical terms.

## VI. The district court erred when it instructed the jury about "as the opportunities arise" bribery

The trial court's definition of bribery erroneously relieved the government's burden of demonstrating that money paid as a bribe must be linked to a specific act or acts in exchange for money or property:

> The government is not required to prove the following things:
>
> ***
>
> Three, which payments controlled particular official acts or that each payment was tied to a specific official act; rather, it is sufficient if the public official understood that he was expected to exercise some influence on the payor's influence on the payor's behalf as opportunities arose.

Jury Instructions, RE 412, Page ID# 15271-72.

In *United States v. Silver,* 948 F.3d 538 (2nd Cir. 2020), the Second Circuit addressed a very similar jury instruction and found it did not adequately instruct the jury on the quid pro quo aspect of bribery consistent with the Supreme Court's decision in *McDonnell*:

> The court instructed the jury on extortion under color of right as follows:
>
> > To satisfy [the quid pro quo] element, the government must prove ... that Mr. Silver obtained property to which he was not entitled by his public office, knowing that it was given in return for official acts as the opportunity arose .... If you find that Mr. Silver understood that the property at issue was given solely to cultivate goodwill or to nurture a relationship with the person or entity who gave the property and not as an exchange for any official

action, then this element has not been proven .... On the
other hand, if you find that Mr. Silver accepted the
property intending, at least in part, to take official action
in exchange for those payments as the opportunity arose,
then [the quid quo pro] element has been satisfied.

Special App. 32–33 (emphases added).

The instructions required that, at the time Silver entered into the quid
pro quo, he believed that the payor expected him to exchange payment
for "official action [to] the benefit of the payor ... as specific
opportunities arose," id. at 30, or "official acts as the opportunity
arose," id. at 33. Although the district court further instructed the jury
that it must find that Silver "made [a decision] on a question or matter
that ... [was] specific, focused, and concrete," id. at 31 (emphasis
added), it did not require that the specific matter—e.g., the receipt of
grant funding (Mesothelioma Scheme) or extending specific tax
programs (Real Estate Scheme)—be identified, or even understood by
Silver, at the time he accepted the bribe.

Analyzing the district court's instructions in the context of the Real
Estate and Mesothelioma Schemes demonstrates both that Silver
overreads McDonnell and that the Government relies on an open-
ended interpretation of Ganim. In our view, the district court's
instructions were erroneous. They only required the jury to find that
Silver understood, at the time that he accepted any quid, that he was
expected to exercise official influence or take official action for the
benefit of the payor. As we explain below, an illegal quid pro quo
under the "as the opportunities arise" theory of bribery requires more
than what the Government presented in this case: an open-ended
promise to perform official actions "for the benefit of the payor."

For the reasons set forth in *Silver,* this Court should similarly hold that the jury instruction given was inadequate and reverse the convictions on all counts except Counts 29 and 30.

## VI.  The district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss.

**A.  Standard of Review.**  "[W]e . . . review a district court's calculation of the advisory sentencing Guidelines as part of our obligation to determine whether the district court imposed a sentence that is procedurally unreasonable." *United States v. Bullock*, 526 F.3d 312, 315 (6th Cir. 2008) (citing *Gall v. United States*, 552 U.S. 38, 51, (2007)). "We review a district court's 'legal conclusions regarding application of the [g]uidelines *de novo*' and any findings of fact for clear error." *United States v. Oliver*, 919 F.3d 393, 397 (6th Cir. 2019) (quoting *United States v. Holcomb*, 625 F.3d 287, 291 (6th Cir. 2010)). The same *de novo* standard applies when a district court's application of the Guidelines involves mixed questions of law and fact. *United States v. Stafford*, 721 F.3d 380, 400 (6th Cir. 2013).

**B.  Overview.**  Hills received a sentence of 188 months.  That is more than the maximum guideline sentence he could have received for voluntary manslaughter (108 months) or distributing 49 kilograms of cocaine while possessing a firearm (168 months).  That sentence was arrived at by grossly

inflating the loss suffered by Metro, by assigning enhancement levels based on an incorrect determination that Hills had a "leadership role," and that he obstructed justice. In short, the sentence was the result of numerous errors in the Guidelines calculations.

**C. The loss calculation.** The district court calculated the loss to Metro at $1,104,501.24, without including any loss for the resident bribery scheme. Transcript, RE 541, Page ID #24143.[5] An analysis of the various components of this loss shows them to be grossly inflated.

**1. The incentive payments.** The district court attributed a loss of $92,829 for the incentive payment received by Alqsous and Al-Madani. Transcript, RE 541, Page ID #24122. As explained *supra,* that figure calculated only the increases granted by Hills, all of which had to be approved by higher-ups, and ignored the *decreases* he ordered. In fact, as explained more fully there*,* both Al-Madani and Alqsous saw a net *decrease* in the incentives they otherwise would have earned. Metro suffered no loss whatsoever from the incentive payments.

**2. Salary for Dr. Nassar.** The district court attributed $105,126.94 for the salary of Dr. Nassar, representing his salary over a two-year period. *Id.,*

---

[5] Since Hills was not charged with accepting bribes to accept residents at Metro, he could not have been responsible for this loss in any event.

Page ID #24128.  There are several problems with this attribution.  The first is that it assumes that Nassar's entire salary represented a loss to Metro, without any consideration of the benefits it received from him working there.  The second is that as noted *supra*, a mistake had been made in calculating his score on the residency test; he actually had the highest score of any of the candidates.  The testimony of Elrawy that Nassar was an excellent dentist and well-qualified for the position confirmed this.

Second, it was Dr. Elrawy, not Hills, who signed off on the paperwork hiring Lufti for the second year.  Dr. Hills was not even working at MetroHealth at the time.

**3.  Salaries for the Flextime program.**  The district court attributed 20% of the salaries earned by Alqsous, Al-Madani, and Elrawy for the years 2010 through 2014 as loss to Metro, for a total amount of $661,176.  *Id*., Page ID #24129.  This figure is based on the idea that because of the Flextime program instituted by Dr. Hills, the dentists worked only 80% of the time they were supposed to.

The flaw in this approach was the assumption that dentists worked like bankers:  they were supposed to be there five days a week, eight hours a day.  As the Flex Time Memo drafted by Dr. Hills showed, employees had to work at least

at least 40 hours a week in order to qualify for Flex Time.  It was the hours they worked, not the days, that were significant. Again, the government introduce no evidence that either worked at Noble Dental at times they were scheduled to work at, and were paid by, Metro.

The evidence also showed that Al-Madani and Alqsous generated substantial income for the hospital, over and above what they were paid.  Dr. Alfred Connors, who served as chief medical officer at MetroHealth during most of this time, acknowledged that Alqsous was "very productive," and that he "had to be there, working a lot, seeing a lot of patients" to "generate the amount of revenue he was generating,"  and that Al-Madani was "one of the most productive in the dental department."  Transcript, RE 404, Page ID #13372, 13437.

In fact, rather than costing Metro money, Hills' supposed co-conspirators made substantial profit for Metro, Alqsous himself accounting for nearly $3 million in gross profit between 2010 and 2014.  Exhibit:  Gross Profit Comparative Chart, RE 449-17, Page ID #17212-57.  U.S.S.G. §2B1.1, comment note 3(e)(1) provides that loss shall be reduced by "the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected."

This is in keeping with this Court's recent decision in *United States v. Kozerski*, 2020 U.S. App. LEXIS 24808 (6th Cir., August 6, 2020). Kozerski had pled to wire fraud for obtaining six government contracts by impersonating a disabled veteran, and the issue was the calculation of the loss. The government argued that the loss amount should have been the value of the contracts without deducting for the value of services provided, which came to approximately $12 million. The district court had determined that the appropriate measure of loss was the difference between Kozerski's bids and the next lowest bids, about $250,000.

This Court affirmed, looking to the definition of loss.

> Two general principles apply to loss calculations. One is that loss generally refers to the pecuniary harm to the victim. [U.S.S.G. §2b1.1(b)(1), cmt. n.3(A)(i) – (iv). In its ordinary use and in the commentary, loss refers to economic harm. *Id*.; see, e.g., Oxford English Dictionary Online (3d ed. 2020) ('Diminution of one's possessions or advantages'). That suggests the court should look to the economic harm (the pecuniary harm) that the government (the victim) suffered, a measurement that normally would pull the value of the services provided into the equation. The other principle is that loss generally turns on adding up the crime's face value and subtracting any value returned to the victim. U.S.S.G. § 2B1.1 cmt. n.3(A), (E).

The district court's loss calculations consistently betrayed these fundamental principles. The belief that Metro suffered a "loss" of over a million dollars in a department which was one of the most productive in the hospital, from dentists who were among the top earners, defies reality. Metro did not lose over $100,000

54

by Nassar's hire; it gained an excellent dentist who more than repaid Metro for the salary it paid him.

The same can be said for Alsqous and Al-Madani. The government's own evidence indicates that they received incentives for their work every month; in other words, they earned more for Metro than Metro paid them. Instead of creating a net loss for Metro, Hills, Alsqous, and Al-Madani created a substantial gain.

**4. Oral Health Enrichment.** The District Court attributed $111,900 to the loss calculation for the Oral Health Enrichment program operated by Hills. (More properly, this was attributed as a gain to Hills rather than a loss to MetroHealth.) Transcript, RE 541, Page ID #24136. But this assumes that the entire amount of money received by Hills was due to the clinical work performed at MetroHealth. As indicated *supra*, 85% of the cost was attributable to didactic services, which had nothing to do with MetroHealth. Only $13,000 should have been attributed as a gain to Hills.

**5. Resident bribery scheme.** The district court made no ruling on the loss attributable to Hills. *Id.*, Page ID #24143. Nor should it. Hills received no benefit from the hiring of those residents, and in fact was not charged with any counts pertaining to them.

**6. Noble Dental Clinic.** The district court attributed $99,961 to the loss calculation for payments made to Hills or OHE. This fails to reflect that Hills worked at Noble Dental for a number of years – in fact, the government attributes $91,961 of this loss to 1099's issue to Hills for 2009-2010, Government Sentencing Memorandum, RE 447, Page ID #16292 – and would have been entitled to receive payment for his work.

**7. Correct calculation of loss.** The amount of loss or gain attributable to Hills' conduct should have been $13,000 for the work on Anthony Jordan (*Id.*, Page ID #24137), $13,000 for Oral Health Enrichment, and $80,426 for taxes. PSR, RE 366 *SEALED*, Page ID #8759, ¶41. The total loss figure should have been $106,426.

**D. High-ranking public official.** The district court not only concluded that the base offense level was 14 because it deemed Hills a public official, it awarded an additional four points by determining that Hills was a public official in a high-level decision-making or sensitive position. Sentencing, RE 541, Page ID #24094, 24147.

The district court's conclusion is legally and factually flawed. U.S.S.G. §2C1.1, Application Note 4 (A), provides that "[h]igh-level decision-making . . . position means a position characterized by a direct authority to make decisions for,

56

or on behalf of, a government department, agency, or other government entity, or by a substantial influence over the decision-making process." Examples of the kinds of positions considered high-ranking decision-making positions include "a prosecuting attorney, a judge, an agency administrator, and any other public official with similar level of authority." U.S.S.G. §2C1.1, Application Note 4 (B).

To reach the conclusion that Hills qualified under that description, the district court conflated his various job descriptions:

> Dr. Hills was executive vice-president and COO of MetroHealth from 2010 through December 31, 2014. He was chair of the Department of Dentistry at MetroHealth from 1997 to 2014 and he was interim president and CEO of MetroHealth for a very brief time during 2012 and 2013.

> Under any of these designations, and we're focusing primarily on the designation as *chair of the Department of Dentistry, as well as COO*, he was a public official in a high-level decision-making position.

Sentencing, RE 541, Page ID #24145-46 (emphasis supplied).

But the government never alleged that the charges against Hills had anything to do with his position as COO of Metro. Moreover, the district court's determination of what powers Hills possessed as chair of the dentistry department is exaggerated. The district court found that "[Hills] had the authority to recommend approval of incentives to dentists in the department." Sentencing, RE 541, Page ID #24146. But as the statement implies, that was subject to approval

57

by Dr. Connors, who signed off on them and acknowledged that there were several occasions when he persuaded Hills to make a smaller adjustment. Transcript, RE 403, Page ID #13120.

**E. Leadership role.** U.S.S.G. §3B1.1 provides that "if a defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels." The district court imposed that enhancement. Sentencing, RE 541, Page ID #24160. Imposition of that enhancement was improper given the evidence actually proved by the Government at trial, for the following reasons.

There is no evidence that the offense conduct involved five or more participants – Hills was charged and convicted with only two other individuals – Alsqous and Al-madani. Arguably, Elrawy, who was not charged, even if considered a participant for purposes of this analysis leaves only a conspiracy involving four participants.

While the Government sought to label other uncharged individuals as "co-conspirators" those labels are not supported by the evidence and are undermined by the fact that none of those individuals have been charged, none have had their day in court, and all of them are free to go about their lives as if they were, in fact, innocent.

Moreover, despite the manner in which the Government chose to charge this case, there was nothing extensive about the alleged criminal conduct in this case. The criminal conduct, according to the Government's theory, can be summarized thusly, (a) Dr. Hills agreed to accept gifts and things of value faculty dentists who were his subordinates in exchange for providing those supervisees a "stream of benefits." Those so-called benefits included a flexible work schedule, which included a requirement that they had to work at least 40 hours per week, and bonuses/incentives that they were first required to earn in accordance with the hospital approved incentive payment formula. (b) Dr. Hills used MetroHealth's dental staff and clinic to perform 9 clinical assessments from 2009-2014 on mannequins and extracted teeth for his private business. (c) Dr. Hills approved free treatment for one patient, an attorney who had done work for him in the past. (d) Dr. Hills took payments from Doctors Alqsous and Al-Madani totaling $17,600 in exchange for authorizing dental staff to refer overflow patients to the private clinics of faculty dentists (even though the Government failed to identify a single patient who was actually referred). There is nothing particularly extensive or complicated about the actual criminal conduct, only the manner in which the Government chose to present it.

Thus, further ratcheting up Dr. Hills' guidelines by applying this enhancement is not supported by the evidence and represents a misapplication of the Guidelines by the Government.

Because the Government's proposed sentence relies on a misapplication of the Guidelines to the facts it actually proved at trial, stacking on these enhancements only serves to unjustly elevate Dr. Hills' offense level. The Government grossly overstates the character and nature of the criminal conduct for which he was convicted and attempts to subject Dr. Hills, instead, to one of the lengthiest sentences of incarceration permitted by the Guidelines, rather than a sentence commensurate with the conduct for which he actually was convicted.

**F. Obstruction of justice.** The district court awarded two enhancement points for obstruction of justice. It based its decision largely on the fact that Hills had been convicted of conspiracy to obstruct justice. As argued *supra*, this conviction was tainted by the introduction of evidence concerning the letter Hills attorney sent to another dentist regarding incorrect information about Hills being arrested. As noted there, that conduct had not been charged in the indictment, and in any event did not constitute obstruction of justice.

Moreover, USSG § 3C1.1 does not apply to conspiracies. When the Commission intends a Guideline to apply to conspiracies it has specifically

indicated as much. See, e.g., USSG § 2C1.1, which applies to "Offering, Giving, Soliciting, or Receiving a Bribe; . . . Conspiracy to Defraud by Interference with Governmental Functions" (emphasis added). As Hills was not convicted of any substantive offense underlying the conspiracy to obstruct justice count, it was error to apply this enhancement.

**G. Two bribes.** The district court awarded a two-level enhancement for two or more bribes. As set forth above, the evidence was insufficient to establish any bribes.

**H. The correct Guideline calculation.** The district came to an adjusted offense level of 40, and granted a four-level variance, reducing it to 36. The actual adjusted offense level should have been 26:

| Base offense level | 14 |
|---|---|
| Loss ($106,426) | +8 |
| TOTAL | 22 |

**I. Restitution.** The district court also ordered restitution in the amount of $916,841.88 to Metro. The basis of that order was the same items which have been discussed at length above. The award was based on adjustments to

incentives, when the adjustments were proper and Metro couldn't have lost money in any event because the incentives didn't kick in until Metro had earned back all the salaries and benefits paid to the employees.  It was based on a theory that Metro lost 20% of the salaries for Alsqous and Al-Madani over a three-year period for work they actually did at other clinics, when no evidence was ever presented that either of them ever worked at other clinics on days they were scheduled to work at Metro.  This money was improperly calculated as a loss, and its calculation as an award of restitution was equally erroneous.

## CONCLUSION

For the foregoing reasons, Defendant-Appellant respectfully prays the Court to vacate the Defendant's convictions; or, in the alternative, reverse and remand the case for a new trial; or, in the alternative, vacate the Defendant's sentences and remand for resentencing.

Respectfully submitted,

/s/ Russell S. Bensing
Russell S. Bensing  (0010602)
600 IMG Building
1360 East Ninth Street
Cleveland, Ohio 44114
Telephone: (216) 241-6650

*Attorney for Defendant-Appellant*
*Edward Hills*

## CERTIFICATE OF COMPLIANCE

In compliance with the Federal Rules of Appellate Procedure 32(a)(7)(B) and (C), I hereby certify that the foregoing Principal Brief of Defendant-Appellant contains 14,414 words.

/s/ Russell S. Bensing
Russell S. Bensing

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief of Defendant-Appellant via electronic filing upon all parties this 13th day of August, 2020.

/s/ Russell S. Bensing
Russell S. Bensing

## DESIGNATION OF RELEVANT DOCUMENTS

| RE | Item | Page ID # |
|---|---|---|
| 1 | Indictment | 1-93 |
| 337 | Jury Verdicts | 5741-5760 |
| 366 | PSR *SEALED* | 8755 |
| 392 | Transcript | 9805, 9872, 9844-45; 9884; 9903-08; 9919-20; 9878-79; 9883 |
| 393 | Transcript | 10021, 10043 |
| 394 | Transcript | 10381; 10453-54, 10456 |
| 395 | Transcript | 10808-10 |
| 397 | Transcript | 11780-81, 11786-87 |
| 398 | Transcript | 11553-54, 11566, 11572-74, 11597; 11363, 11380-81 |
| 399 | Transcript | 12014; 12015, 12020; 11884, 11887-88, 11900, 11901, 11909; 11914, 11917; 11833-34; 11824-25; 11847; 12000-01 |
| 400 | Transcript | 12234-35; 12129-30; 12109, 12129, 12132; 12667 |
| 401 | Transcript | 12514, 12532, 12579; 12296, 12381; 12410 |
| 402 | Transcript | 12709-14; 12678, 12792 |
| 403 | Transcript | 12880-93; 12961, 12967; 13375; 13097-13098; 13118, 13120 |

| | | |
|---|---|---|
| 404 | Transcript | 13369, 13420; 13242, 13237; 13372, 13466, 13437 |
| 405 | Transcript | 13604-07; 13675-13681, 13684 |
| 406 | Transcript | 13859, 13999 |
| 407 | Transcript | 14121; 14159-61, 14175-86; 14001; 13756-59; 13769; 13370; 13818-19, 13805, 13855, 13890; 13966-67; 13953 |
| 408 | Transcript | 14152-58;14157-58; 14344; 14250, 14252-62; 14269; 14169-74, 14186 |
| 409 | Transcript | 14491-94 |
| 410 | Transcript | 14830, 14835 |
| 411 | Transcript | 15161, 15166 |
| 412 | Transcript | 15270-72 |
| 447 | Gov't Sentencing Memo | 16292 |
| 449 | Gross Profit Chart | 17212-57 |
| -17 | | |
| 451 | Sentencing Memorandum | 18397, 18398; 18407 |
| 489 | Judgment Entry | 20045-51 |
| 497 | Notice of Appeal | 20077-78 |
| 515 | Order | 20241-42 |
| 541 | Transcript | 24143, 24122, 24128, 24129, 21436, 24094, 24145-47, 24160 |