No. 19-3372

# IN THE
# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

—————————

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

EDWARD HILLS,

*Defendant-Appellant.*

**On Appeal from the United States District Court
for the Northern District of Ohio, Eastern Division,
Case Number 16cr329**

—————————

## REPLY BRIEF OF DEFENDANT-APPELLANT
## EDWARD HILLS
—————————

RUSSELL S. BENSING
600 IMG BUILDING
1360 EAST NINTH STREET
CLEVELAND, OH 44114
(216) 241-6650

*Counsel for Defendant-Appellant
Edward Hills*

**ORAL ARGUMENT REQUESTED**

# TABLE OF CONTENTS

Table of Authorities ............................................................................................... iii

Statement of Issues ................................................................................................... 1

Statement of the Case and the Facts ....................................................................... 2

Law and Argument .................................................................................................... 2

   I.  The District Court erred in denying the motion for judgment of acquittal as to Counts 1, 8, 13, 14-20, and 29. ................................................................................. 2

     A. The stream of benefits. .................................................................................. 3

       1.  Increasing bonuses. .................................................................................. 4

       2.  Scheduling. ............................................................................................... 5

       3.  Oral Health Enrichment. ......................................................................... 6

       4.  Dental kickback scheme. ......................................................................... 7

       5.  Obstruction of justice. ............................................................................. 8

       6.  Free Labor at Noble Dental. .................................................................... 8

   II.  The District Court erred in denying the motion for judgment of acquittal as to Count 2. ................................................................................................................ 8

   III.  The district court erred in its jury instructions on Hobbs Act conspiracy by refusing to give an instruction on a requirement that there be an overt act ......... 11

   IV.  The district court erred when it failed to instruct the jury that actions taken in "good faith" are not done with an intent to defraud ........................................ 12

   VI.  The district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss. ................................... 13

     A. Benefit of full-time pay for part-time work. ............................................. 13

     B. The incentive payments. ............................................................................ 14

     C. Lufti Nassar salary. ................................................................................... 15

Conclusion ................................................................................................................ 16

Certificate of Compliance ....................................................................................... 17

i

Certificate of Service ...............................................................................................17

# TABLE OF AUTHORITIES

**Cases**

*McDonell v. United States*, 136, S.Ct. 2355 (2016) ...................................................8

*Union Pacific Railway Co. v. United States,* 865 F.3d 1045 (8th Cir. 2017)..........11

*United State v. Gray,* 790 F.2d 1290 (6th Cir. 1986), *ov'd by McNally v. United States,* 483 U.S. 350 (1987) ....................................................................................10

*United States v. Barger*, 931 F.2d 359 (6th Cir. 1991)..............................................3

*United States v. Benton,* 852 F.2d 1456 (6th Cir. 1988).........................................11

*United States v. Lee,* 919 F.3d 340, 358 (6th Cir. 2019) .........................................9

*United States v. Maliszewski*, 161 F.3d 992 (6th Cir. 1998) ....................................3

*United States v. Shelton,* 573 F.2d 917 (6th Cir. 1978) ..........................................11

**Statutes**

18 U.S.C. 13 ...........................................................................................................11

## STATEMENT OF ISSUES

I.  Whether the district court erred in denying Appellant's Rule 29 Motion, as there was insufficient evidence of Appellant's guilt of the RICO conspiracy charges and substantive counts.

II.  Whether the district court erred in denying Appellant's Rule 29 Motion, as there was insufficient evidence of Appellant's guilt of the Hobbs Act conspiracy charge and substantive counts.

III.  Whether the district court erred in its jury instructions on Hobbs Act conspiracy, honest services fraud, and public official status, and in failing to give a "good faith" instruction.

IV.  Whether the district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss, and in its order of restitution.

The briefs of the parties to this point have been sufficient to acquaint the Court with the basic facts of the case and the proceedings. Rejoinder to the government's version of those facts, where rejoinder is necessary, will be made in the argument portion of this Reply Brief. Moreover, in light of the hundreds of pages of briefs filed by the parties to date, Hills will limit himself to addressing those portions of the government's brief which bear further response. A failure to respond to a particular argument should not be deemed as a concession or waiver of the argument; it simply means that the issue is adequately covered in Hills' Merit Brief.

## LAW AND ARGUMENT

## I. The District Court erred in denying the motion for judgment of acquittal as to Counts 1, 8, 13, 14-20, and 29.

Count 1 of the indictment charged the defendants with a conspiracy to violate the RICO statute. The remaining counts listed above charged the defendants with the substantive offenses.

In its reply, the government begins by setting forth the boilerplate law regarding conspiracy. This is mostly unnecessary; for example, Hills has never maintained that he did not know "every member of the conspiracy or knew the full

extent of the enterprise." Government's Brief at 48; *United States v. Maliszewski*, 161 F.3d 992, 1006 (6th Cir. 1998). Nor has he claimed that the lack of a formal agreement precluded conviction. *Id.*; *United States v. Barger*, 931 F.2d 359, 369 (6th Cir. 1991). Hills' argument is simple: he did not commit any crimes.

The government correctly points out that conviction of a RICO conspiracy does not require proof of any overt acts. Again, though, this is beside the point. Conviction does require proof that the defendants conspired to commit illegal acts. If the acts themselves were not illegal, a conspiracy to commit them cannot be, either.

Thus, the question is whether the evidence was sufficient to prove the illegality of any of the schemes the government claims the defendants' conspired to commit. Much of that argument was set forth in Hills' Merit Brief; the following will be a response to the arguments raised by the government.

**A. The stream of benefits.** There is no question that Hills received items of value from the co-defendants Alqsous and Al-Madani. The benefits were not as extensive as the government made them out to be; for example, while the government repeats its claim that Alqsous deposited money into Hills' account in return for various favors, it ignores the fact that the government agents never found

withdrawals from Alqsous' accounts that corresponded to deposits in Hills'. Transcript, RE 403, Page ID #12961, 12967.

In any event, there was nothing illegal about the gifts to Hills, and they had no effect on Metro anyway: whether Alqsous paid for an apartment for Hills girlfriend was of no consequence to Metro. What makes it consequential, the government argues, is what Hills did in return for this: the benefits he bestowed upon Alqsous and Al-Madani, to the detriment of Metro. The government points to a number of them:[1]

**1. Increasing bonuses.** The argument that Hills routinely increased incentives in return for favors relies entirely upon the testimony of Elrawy, one of the supposed co-conspirators who wound up testifying for the government. As recounted in Hills' Main Brief, his testimony was suspect in numerous respects: he claimed he was patted down at a meeting he recorded, although the recording shows no evidence of this, and his story "evolved" over time and innumerable statements. (See Hills Main Brief at 17.)

---

[1] The government also cites what it terms the residency bribery scheme, *i.e.*, that Alqsous and Al-Madani demanded bribes from various persons in return for having them admitted into Metro's residency program. That activity was charged in Counts 3 through 7. Hills was not charged in those counts, and the government makes no claim that Hills involved in that scheme.

Much more significantly, it runs contrary to the facts.  To clarify, there can be no argument that the incentives themselves were given in return for any benefits bestowed upon Hills.  The incentives were part of the compensation package:  a dentist would be paid 25% of whatever he earned over and above what the hospital shelled out for him in salary and benefits.  The government's argument is that the incentives were themselves adjusted upwards by Hills in return for the benefits.

But in order to prove this, the government would have to show that the incentives were increased with at least a modicum of consistency.  The weren't.  Alqsous received increased incentives because he was coming in on his off-days to fill in for Dr. Kirlough; the increase in his incentives was commensurate with the decrease in Kirlough's.  Transcript, RE 408, Page ID #14152-14158.  Alqsous never received any upwards adjustment of his incentive after Kirlough left the hospital in July of 2013.  *Id.*, Page ID #14157-14158.

As recounted in Hills' Main Brief, the evidence that Al-Madani received extra incentives is even weaker.  He never received a net upward adjustment in any single year; in 2014 alone, his incentives were actually *reduced* by $7,305.

   **2. Scheduling.**  The government claims that the stream of benefits was conveyed to Hills in return for him instituting a "flex-time" policy which allowed them to work less than five days a week.  This also served as the largest

basis for the claim of damages to Metro; the district court determined that Metro had suffered a loss of over $600,000 as a result of the doctors working four days instead of five.

The problem with this argument is that, again, while it may work in the abstract, it does not square with the facts. If the dentists were actually spending less time working at Metro, that should have shown up in the figures: Metro kept meticulous count of exactly how much the doctors brought in, because that's what the incentives were based on. In fact, the productivity of the dentists *declined* after Hills left and the flex-time policy was eliminated. Transcript, RE 403, Page ID #13141.

      **3. Oral Health Enrichment.** Hills ran a business aimed at providing assistance to dentists who had their licenses suspended, by providing both written and clinical examinations. The government's entire case here hinged on use of Metro for the latter, claiming that the examinations deprived Metro of dentist chairs which they could have used for actual patients.

Again, the evidence fails to support this. The government cites testimony by three dentists – Akins, Walker, and Abadi – to this effect, but Akin testified that his examination was performed on a Saturday morning, Walker testified that his took all of ten to fifteen minutes, and Abadi's wasn't even performed at Metro: it

was done at the dental office of a family friend.  Transcript, RE 398, Page ID #11569; *Id.*, Page ID #11363; Transcript, RE 399, Page ID #11498.

      **4.  Dental kickback scheme.**  The government devoted a major portion of its case to the claim that the stream of benefits to Hills was in return for his decision to allow patients to be referred to Buckey Dental, where Al-Madani and Alqsous had side jobs.  The government doesn't address the wealth of testimony by its own witnesses that the move was necessitated by the immense overcrowding at the dental clinic as a result of the adoption of the Care Plus program there.  See Hills Merit Brief, pp. 27-29.

      As indicated in Hills' Merit Brief, the government's case was further complicated by the fact that it could not point to a single patient who had been referred.  It attempts to recover from this by pointing to the testimony of Thandeka Cox that "over 100 patients were referred to Buckeye for dental work."  Government Merit Brief at 69.  A closer examination of Cox's testimony shows it far less exact:  while on direct examination she did state that "at least a hundred" were referred, she had no idea how many actually went, and on cross-examination admitted she did not have a definite number.  Transcript, RE 400, Page ID #12208, 12016.

**5. Obstruction of justice.** This is dealt with extensively in Hills Merit Brief, at pp. 29-33. The government again makes much of the assertion that Hills told Elrawy and the co-defendants to fend off inquiries by the FBI, again ignoring the fact that Hills expressly told the other to "do it legally." Transcript, RE 407, Page ID #13891.

**6. Free Labor at Noble Dental.** The government claims that Hills deprived Metro of money by having Al-Madani and Alqsous work at Noble Dental, in return for Noble Dental paying him a fee for that. In his Merit Brief, Hills noted that the among the government's production of 44 witnesses and 2,000 exhibits, there was nothing showing that Alqsous or Al-Madani ever worked at Noble when they were scheduled to work at Metro. That omission is not cured by the government's brief.

## II. The District Court erred in denying the motion for judgment of acquittal as to Count 2.

Hills argues, at page 39 of his Merit Brief, that the routine assigning of dentist shifts and adjustment of salaries and incentive payments do not constitute "official act[s]' under *McDonell v. United States*, 136, S.Ct. 2355 (2016). As previously discussed, *McDonnell* recognized that not every action taken by a public official (but see infra regarding whether Hill can even be considered a

"public official"), is an "official act."  While the government sets forth in detail that it believes Hills agreed to increase payments in return for things of value, it ignores in its sufficiency discussion what the defense believes is an equally important question:  Assuming Hills agreed to do something, was that something an "official act."  For the reasons previously stated the something to which Hills agreed was not an official act or acts.

The closest the government comes to addressing this question is in its discussion of the definition of "official act." (Government Brief at 86-88).  Once again, the government emphasizes that Hills exercised decision making authority in determining schedules and payments.  But *McDonnell* recognizes that many decisions made by even the highest office holders are not "official acts."  When Governor McDonnell chose to meet with certain people and create opportunities for networking, he exercised discretion in how to utilize government resources, including his time, the physical surroundings for the meeting, etc.  But the Court nonetheless held that this was not enough for the Hobbs Act.  Rather, the type of decision making must be akin to a lawsuit before a court or official agency determination.  *United States v. Lee,* 919 F.3d 340, 358 (6th Cir. 2019) (citing *McDonnell).*  And this distinction remains unaddressed by the government, even if one bootstraps the jury instruction analysis onto the sufficiency analysis.

With respect to whether Hills was a "public official," the government is likewise silent in addressing the question of sufficiency.  The government later addresses the "public official" issue in its discussion of jury instructions where it cites to the Sixth Circuit Pattern Jury Instructions for the proposition that a "public official" is a government employee. (Brief of Appellee at 85-86).   But that instruction relies on two distinguishable lines of authority:  (1) The decision of this Court in *United State v. Gray,* 790 F.2d 1290 (6th Cir. 1986), *ov'd by McNally v. United States,* 483 U.S. 350 (1987), a case not involving the Hobbs Act; and (2) the Ohio Revised Code.

Reliance on *Gray* is misplaced.  *Gray* was not a Hobbs Act case.  Moreover, the defendants in Gray were exercising power and influence over a significant government contract -- defendant Gray was a gubenatorial cabinet member and defendant Hunt was the state Democratic Party chair.  Thus, *Gray* was dealing with precisely the type of high-ranking authority that is consistent with *McDonnell's* recognition that the Hobbs Act addresses official acts by those authorized to conduct such high-level decision making.  And this is not what Hills was doing when he determined which dentist would work which day of the week.

The government's reliance upon  the Ohio Revised Code's definition of "public official" is misdirected.  The Hobbs Act does not incorporate by reference

the applicable State law regarding who is and who is not the subject of the Hobbs Act. If so, a State could exempt its employees from the Hobbs Act by merely changing its definition of "public official." Congress knows how to reference State law when it so desires. *See, e.g.,* 18 U.S.C. 13 (Assimilative Crimes Act). Its decision not to reference state law in the Hobbs Act must thus be interpreted as intending not to rely upon a state law definition. *Union Pacific Railway Co. v. United States,* 865 F.3d 1045, 1049-1050 (8th Cir. 2017).

### III. The district court erred in its jury instructions on Hobbs Act conspiracy by refusing to give an instruction on a requirement that there be an overt act.

Hills, along with codefendant Al-Madani, have argued that the district court erred in not instructing the jury that an overt act must be proven to find a Hobbs Act conspiracy exists. In this regard, the defense has relied upon this Court's decision in *United States v. Benton,* 852 F.2d 1456, 1465 (6th Cir. 1988).

The government maintains that *Benton* cannot be reconciled with *United States v. Shelton,* 573 F.2d 917, 919 (6th Cir. 1978) because, according to the government, *Shelton* came first and held that an overt act was not legally required to prove conspiracy.

The government's argument fails for two reasons. First, *Shelton* merely held that an act of actual extortion was not required for conspiracy to violate the Hobbs Act, which is different than proof of an overt act (which, as this Court is well aware, need not even be criminal in and of itself). Second, *Benton* being more recent causes it to be the more authoritative decision of this Court.

## IV. The district court erred when it failed to instruct the jury that actions taken in "good faith" are not done with an intent to defraud.

In response to Hills' claim that a good faith instruction should have been given, the government first claims a lack of understanding as to exactly what instruction was requested, noting that the record "does not reflect the requested instruction." This argument might have some legs if not for the fact that this Court has devoted substantial time and effort to promulgating standard pattern jury instructions, thereby relieving litigants of the duty to precisely articulate what instruction they are requesting. It is the standard practice in this circuit – as in virtually all circuits – for a party to simply request a jury instruction by name. The government rejects that inference, contending it is improper because the defendants objected to the use of pattern jury instructions regarding the Hobbs Act and other issues. It is difficult to understand how the defendants' rejection of other pattern jury instructions – objections which were accompanied by concrete proposals as to

how they should be given – suggests that the defendants were thinking of something else entirely when they proposed giving the pattern jury instructions on good faith.

The government next contends that the instruction was unnecessary, because the instructions the court did give adequately covered the topic; the jury could determine whether the defendants' actions were illegal without resort to considering the issue of good faith. In short, illegality is the converse of good faith, and consideration of the former dispenses with the need for the latter.

But this logic renders the good faith instruction a nullity; the instruction is inevitably subsumed by the jury's consideration of whether the defendant's acts were illegal. This is not the law.

## VI. The district court's sentence was procedurally unreasonable in utilizing incorrect enhancements and improperly calculating loss.

**A. Benefit of full-time pay for part-time work.** By far the biggest single item of loss calculation was the $661,176 for the supposed benefit to Al-Madani and Alqsous for the working four instead of five days per week. The calculation was simply done: the district court determined that one-fifth of their salaries should be categorized as a loss.

As explained earlier, however, this assumes that the only benefit the dentists conveyed to Metro was in the hours they worked.  In fact, Metro's compensation system had nothing to do with how many hours the dentists worked, but by how much they brought in.  The supposed loss (or gain) could've been easily calculated by simply calculating the amount of income the dentists brought in before the Flex-time policy was instituted (and after it was eliminated), and comparing it to the amount of income they brought in during the period the Flex-Time policy was in operation.

But that didn't happen here.  There was no evidence introduced that the earnings generated for Metro went down during the period the Flex-Time policy was in operation; in fact, the evidence showed that productivity declined – the dentists brought in less money for Metro – after the Flex-Time policy was eliminated.   Transcript, RE 403, Page ID #13141.

**B.  The incentive payments.**  As set forth in Hills' Merit Brief, there was no basis for the $92,829 the court awarded as damages for the increases to the incentive payments received by Alqsous and Al-Madani and granted by Hills.  That calculation ignored the decreases he ordered; in fact, Alqsous and Al-Madani received less incentives than Metro's policy would have allowed.  See supra at 5-6; Hills Merit Brief at 51.

14

**C. Lufti Nassar salary.** The government argues that the salary for Dr. Lufti Nassar – $105,126.94 over two years – should be attributed to the defendants as a benefit received. Obviously, it was not a loss to Metro, as the government concedes, he generated sufficient revenues to pay his salary and benefits. Ignoring for the moment that the only reason Nassar wasn't included in the residency hire was because his score on the exam had been miscalculated – he actually placed higher than the other three residents – it is unclear how a "benefit" to him should have been included in the calculation. After all, he, not the other defendants, received the salary. They received no benefit from his hiring.

The loss/benefit calculation should have been $106,426, for an enhancement of eight levels, rather than fourteen.

The remaining loss or benefit figures, and the other adjustments, were adequately addressed in Hills' Merit Brief.

## CONCLUSION

For the foregoing reasons, Defendant-Appellant respectfully prays the Court to vacate the Defendant's convictions; or, in the alternative, reverse and remand the case for a new trial; or, in the alternative, vacate the Defendant's sentences and remand for resentencing.

Respectfully submitted,

/s/ Russell S. Bensing
Russell S. Bensing  (0010602)
600 IMG Building
1360 East Ninth Street
Cleveland, Ohio 44114
Telephone: (216) 241-6650

*Attorney for Defendant-Appellant*
*Edward Hills*

## CERTIFICATE OF COMPLIANCE

In compliance with the Federal Rules of Appellate Procedure 32(a)(7)(B) and (C), I hereby certify that the foregoing Reply Brief of Defendant-Appellant Edward Hills contains 3,963 words.

/s/ Russell S. Bensing
Russell S. Bensing

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of the foregoing Brief of Defendant-Appellant via electronic filing upon all parties this 12th day of July, 2021

/s/ Russell S. Bensing
Russell S. Bensing